NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

KEVIN CLEMENTE, *et al.*,

        Plaintiffs,

v.

JANE DOE, *et al.*,

        Defendants.

Civil Action No. 24-314 (MAS) (JBD)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

    This matter comes before the Court upon Plaintiffs Kevin Clemente ("Clemente") and Barbara Clemente's (collectively "Plaintiffs") *ex parte* motion for a temporary restraining order against various defendants[1] ("Defendants"). (ECF No. 3.) The Court held an *ex parte* telephone conference on Tuesday, January 23, 2024, to discuss Plaintiffs' motion. (*See* ECF No. 4.) After consideration of Plaintiffs' submission, the Court decides Plaintiffs' motion without oral argument pursuant to Local Civil Rule 78.1. For the reasons outlined below, Plaintiffs' motion is denied.

---

[1] Plaintiffs list several corporate entities as defendants. Those entities are: Trendy Digital Consulting, Inc., Maehal Enterprises, Inc., Guangda Logistics, Inc., Aurorral Trade, Inc., Pengyuan, Inc., Danco Global, Inc., Middlesex Truck and Auto Body, Inc., WLF Trading Limited, Huayi Access Co. Limited, and Wenyexing Limited. (Compl. ¶¶ 7-16, ECF No. 1.) Each of these Defendants is alleged to have maintained a bank account that fraudulently harbored Plaintiffs' money. Plaintiffs also name an unidentified individual defendant in their Complaint. (*Id.* ¶¶ 2-17.)

I.  **BACKGROUND**

Plaintiffs are both 71 years old and New Jersey citizens. (Compl. ¶¶ 4-5.) In December 2022, an unidentified defendant ("Jane Doe") reached out to Clemente representing that she lives in San Diego, California and profitably trades cryptocurrency derivatives. (*Id.* ¶¶ 25, 27.) Based on Jane Doe's representations, in January 2023, Clemente registered for an account on a perceived cryptocurrency trading platform named "3A." (*Id.* ¶ 28.) Jane Doe demonstrated to Clemente how to perform trades on the platform. (*Id.* ¶ 29.) Jane Doe's trades appeared to return large profits. (*Id.*) In fact, however, no real trades were being executed. (*Id.*)

Between January 2023 and March 2023, Clemente began trading on 3A for his own benefit. (*Id.* ¶¶ 30-33.) In total, Clemente transferred $299,350 from Plaintiffs' joint bank account to Defendants for the purpose of funding Clemente's investment account on 3A. (*Id.* ¶ 33.) To Clemente's knowledge, the trades he thought he was performing on 3A generated $1.4 million in total profits. (*Id.* ¶ 34.) Accordingly, given the large purported profits, Clemente attempted to withdraw money from 3A. (*Id.*)

When Clemente first attempted a withdrawal, he was advised that he needed to prepay taxes on his investment profits. (*Id.* ¶ 35.) On April 12, 2023, Clemente wired $133,565 to a bank account at JPMorgan Chase Bank for this purpose. (*Id.* ¶¶ 35, 44.) Clemente was then advised that JPMorgan Chase Bank froze Clemente's funds, and that he must pay the same amount, $133,565, a second time to a different account. (*Id.* ¶ 35.) Again, Clemente obliged. (*Id.* ¶ 36.) On May 26, 2023, Clemente received two purported bank wire receipts which indicated that a $480,000 wire was sent to his TD Bank account and that $480,000 was sent to his PNC Bank account. (*Id.* ¶ 37.) Clemente never received these wire transfers, nor did Clemente's banks ever show such transfers as pending. (*Id.* ¶ 38.)

2

On June 4, 2023, an unknown 3A customer service representative advised Clemente that the $480,000 wire payments he requested were stopped by the Office of the Comptroller ("OCC") and the Financial Crimes Enforcement Network ("FinCen"). (*Id.* ¶ 39.) The same representative then informed Clemente that the only way he could release the frozen funds was to pay an additional $150,000. (*Id.* ¶ 40.) In purported service to Clemente, the representative later was able to reduce the amount Clemente owed to $80,000. (*Id.*) Clemente once again made the requested payment. (*Id.*) A few weeks later, Clemente sent one last $70,000 wire transfer to try and access his chimerical cryptocurrency earnings. (*Id.* ¶ 41.)

In the end, Plaintiffs paid Defendants $716,480 to various bank accounts at JPMorgan Chase Bank, Cathay Bank, and DBS Bank. (*Id.* ¶¶ 44, 45.) Plaintiffs never received any funds in return. (*Id.* ¶ 49.)

By the end of June 2023, Plaintiffs began to suspect that 3A and Jane Doe had orchestrated a fraud. (*Id.* ¶ 47.) As such, Clemente made no further payments and sought the assistance of a private investigator. (*Id.* ¶ 50.) The private investigator issued a lengthy report concluding that Plaintiffs were the victims of a fraudulent scheme. (*Id.* ¶¶ 50-52.) The Court reviewed *ex parte* the private investigator's report and finds the private investigator's fraud conclusions persuasive. Notably, however, the investigator's report does not offer any insight into whether Plaintiffs' allegedly stolen funds are still within the bank accounts identified in the report, or whether Defendants previously dissipated Plaintiffs' assets.

On the above facts, Plaintiffs file this civil suit alleging: (1) common-law fraud; (2) conversion; (3) conspiracy; and (4) securities fraud. (Compl. ¶¶ 59-86.) Plaintiffs, in moving for an *ex parte* temporary restraining order ("TRO") request that this Court freeze the bank accounts which Clemente wired funds to.

## II.  LEGAL STANDARD

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances."[2] *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotation marks and citation omitted). This remedy should be granted only if plaintiffs establish that: (1) "they are likely to succeed on the merits of their claims"; (2) "they are likely to suffer irreparable harm without relief"; (3) "the balance of harms favors them"; and (4) "relief is in the public interest." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (citation omitted). "A plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mars Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (citation omitted). With respect to the first factor, "on an application for injunctive relief, the movant need only make a showing of reasonable probability, not the certainty, of success on the merits." *Atl. City Coin & Slot Serv. Co., Inc. v. IGT*, 14 F. Supp. 2d 644, 657 (D.N.J. 1998) (internal quotation marks and citations omitted). In the end, however, "[t]he burden is on the moving party 'to convince the district court that all four factors favor preliminary relief.'" *Peter v. Att'y Gen. of N.J.*, No. 23-3337, 2023 WL 4627866, at *1 (D.N.J. July 19, 2023) (quoting *AT&T v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)).

Where a party moves for temporary injunctive relief *ex parte*, it must meet an even more rigorous standard. As the Supreme Court observed:

> The stringent restrictions imposed . . . by Rule 65, on the availability of *ex parte* temporary restraining orders reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute. *Ex parte* temporary restraining orders are no doubt necessary in certain circumstances . . . but under federal law they should be restricted to serving their underlying

---

[2] Temporary restraining orders and preliminary injunctions require the same elements be met. *Koons v. Reynolds*, 649 F. Supp. 3d 14, 22 (D.N.J. 2023).

4

>  purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer.

*Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 438-39 (1974) (footnotes omitted).

### III.  DISCUSSION

The Court finds that Plaintiffs cannot show irreparable harm. Accordingly, the Court focuses only on its irreparable harm analysis below as all four preliminary injunction factors must be met by a plaintiff in order to succeed in moving for a TRO.

"In general, to show irreparable harm a plaintiff must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)); *see Sampson v. Murray*, 415 U.S. 61, 90 (1974). This typically means that economic injuries alone cannot be a sufficient basis for a Court to issue a TRO, because they are by their very nature, remunerable. *See Frank's GMC Truck Ctr. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988); *see also Acierno*, 40 F.3d at 653 (quoting *Sampson*, 415 U.S. at 90, 94). Only in such instances where a harm occurs for which "money cannot atone," may a court find irreparable harm. *Acierno*, 40 F.3d at 653 (quoting *A.O. Smith Corp. v. F.T.C.*, 530 F.2d 515, 525 (3d Cir. 1976)).

Here, Plaintiffs seek to recollect their monetary loss that they allegedly suffered as a result of Defendants' fraud. (Compl., Prayer for Relief ¶ II.) While upon consideration of Plaintiffs' *ex parte* submissions and briefing, the Court is persuaded that Defendants' actions in this case are likely nefarious, this Court's hands are tied as to the emergent *ex parte* relief Plaintiffs seek. It simply cannot credit Plaintiffs' speculation, no matter how reasonably deduced, that a TRO is appropriate in this matter because Defendants will likely dissipate bank account assets if they become aware of this lawsuit. *Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 528 (D. N.J.

5

1999) (citing *Acierno*, 40 F.3d at 655 ("The mere risk of irreparable harm or the possibility of a remote future injury is not enough" for a court to issue a temporary restraining order)). Crucially, preventing this Court from granting Plaintiffs' requested relief is an absence of: (1) ascertainable evidence that the bank accounts Plaintiffs seek to freeze currently contain funds that Plaintiffs may be able to reach; (2) ascertainable evidence that Defendants previously dissipated funds from the named accounts to offshore or otherwise inaccessible accounts; or (3) any other concrete evidence that this Court's freezing of the challenged bank accounts would be fruitful.

Ultimately, in seeking to convince the Court that it may find irreparable harm here, Plaintiffs cite two cases to support the proposition that "Third Circuit courts have found the risk of irreparable harm in matters concerning fraudulent transfer of money due to the risk of anonymous and speedy asset dissipation." (Pl.'s Moving Br. 10-11, ECF No. 3-1.) Those two cases are: (1) *Elliot v. Kiesewetter*, 98 F.3d 47, 58 (3d Cir. 1996); and (2) *Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 532 (D.N.J. 1999). (*Id.*) The facts underlying both cases, however, are materially different from those underlying the instant matter.

In *Elliot*, the Third Circuit affirmed a district court's asset freeze order where the district court froze certain beneficiaries' assets in an estate matter after it became evident that the defendant "acquired . . . property rights in the [beneficiaries'] assets without their knowledge or consent." 98 F.3d at 51. This fraudulent acquisition then, allegedly, "resulted in the dissipation of the family assets that had been placed in their names." *Id.* Sometime later, the beneficiaries' claims against the defendant were tried, and the beneficiaries won a jury verdict against the defendant. *Id.* The beneficiaries were able to establish at trial that the assets at issue had a "principal value of over $3.4 million[,]" and that "[t]he evidence established that [the beneficiaries'] interest in the[] assets w[as] placed into accounts held only in [the defendant's] name." *Id.*

Critically, the beneficiaries in moving for injunctive relief "relied on facts adduced at trial and [a] jury's verdict" in asking the district court to freeze the defendant's assets. *Id.* at 52. Even more importantly, the defendant in *Elliot* also had an opportunity to oppose the family's motion to freeze his assets. *Id.* It was only in this context that the Third Circuit found, and as Plaintiffs identify:

> [A] party seeking an asset freeze to preserve a money judgment may show irreparable injury by showing that the freeze is necessary to prevent the consumption, dissipation, or fraudulent conveyance of the assets that the party pursing the asset freeze seeks to recover in the underlying litigation. The fact that the assets subject to the [freeze order] are primarily money assets does not preclude entry of a freeze order enjoying the use of those assets.

*Id.* at 58.

Here, unlike in *Elliot*, and as mentioned above, Plaintiffs provide no evidence that the bank accounts it seeks to freeze contain the assets they seek, nor do Plaintiffs provide evidence that Defendants may imminently dissipate funds. Plaintiffs can only speculate that Defendants *may* dissipate the funds *if* those funds are in the identified bank accounts. (*See* Pls.' Moving Br. 10 ("Plaintiffs' Verified Complaint demonstrates that Plaintiffs will suffer immediate irreparable harm *if* their assets . . . are dissipated by Defendants." (emphasis added)).) Even more significantly, in *Elliot*, the defendant was known to the Court and Plaintiffs and was able to oppose the motion to freeze his assets. 98 F.3d at 52. Here, Plaintiffs ask the Court to freeze Defendants' bank accounts without notice to Defendants. As such, the facts underlying *Elliot* are materially different from the facts at bar, and *Elliot* therefore does not support Plaintiffs' assertion that, on the facts before the Court, the Court may find a risk of irreparable harm sufficient to grant a TRO.

The facts of the second case Plaintiffs cite are also materially distinguishable from the facts before the Court. In *Marsellis*, defendants were accused of various fraudulent activities rendering

them susceptible to civil and criminal prosecution under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). 51 F. Supp. 2d at 511. Importantly, in moving to freeze certain of the defendants' monetary assets, the plaintiff in *Marsellis* focused its irreparable harm argument on the fact that the defendants had "already altered and destroyed business records . . . [and] manufactured false business records in an attempt to [in part] undermine . . . discovery of their misconduct." *Id.* at 512, 529. The Court wrote extensively on how the risk of further document destruction constituted irreparable harm. *Id.* at 528-32. While Plaintiffs correctly identify that the *Marsellis* Court later suggested that the *Marsellis* defendants' past fraudulent behavior and document destruction tended to suggest an immediate risk of monetary asset dissipation, (*see id.* at 530-31), crucially, like in *Ellio*t, the defendants in *Marsellis* were known to the court and had an opportunity to oppose the plaintiff's motion (*id.* at 530-31).

      Here, Defendants have not had an opportunity to oppose Plaintiffs' motion, and in fact, are not even on notice that their assets may be frozen. As such, *Marsellis*, like *Elliot*, does not support Plaintiffs' contention that the law condones freezing Defendants' bank accounts without notice. The Court also notes that in *Marsellis*, the plaintiff alleged that the defendants were actively engaged in document destruction, providing an independent basis for the court's irreparable harm finding. *Marsellis*, 51 F. Supp. 2d at 529-32. Here, as noted earlier, Plaintiffs submit no evidence purporting to show Defendants are actively dissipating assets or otherwise engaged in nefarious activity that may alternatively justify this Court finding irreparable harm. For these reasons, the facts underlying *Marsellis* are materially distinguishable from the facts before the Court. As such, neither *Elliot* nor *Marsellis* supports this Court freezing Defendants' alleged bank accounts before Defendants have had a chance to be heard.

In sum, in order to grant Plaintiffs' motion, this Court would have to rely solely on speculative, albeit reasonable, concerns that Defendants may try to hide Plaintiffs' assets if put on notice of this lawsuit. Such reasonable speculation, however, is not sufficient for the Court to grant an "extraordinary remedy" that should "only be granted in limited circumstances." *Kos Pharms., Inc.*, 369 F.3d at 708; *see Marsellis*, 51 F. Supp. 2d at 528 (citing *Acierno*, 40 F.3d at 655 ("The mere risk of irreparable harm or the possibility of a remote future injury is not enough" for a court to issue a temporary restraining order)). As such, Plaintiffs' motion must be denied.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' motion is denied. While the Court cannot grant Plaintiffs' TRO, Plaintiffs are not foreclosed from filing another motion for a preliminary injunction once Defendants have been put on notice of this lawsuit. An appropriate order will follow.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE